(No. 54451.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WALTER STEWART, Appellant.

*Opinion filed February 22, 1984.—Rehearing denied June 4, 1984.*

472

MORAN, SIMON, and GOLDENHERSH, JJ., dissenting.

Robert Agostinelli, Deputy Defender, and Verlin R. F. Meinz, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, and Charles W. Hoffman, of Chicago, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, and Michael E. Shabat and David A. Stoioff, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

The defendant, Walter Stewart, pleaded guilty in the circuit court of Cook County to the murders of two persons, the attempted murder of a third person, and the armed robbery of the Empire Jewelry Store in Berwyn. Linda Manzano, who was shot in the course of the robbery, was the proprietor of the jewelry store. The two persons who were murdered, Danilo Rodica and Thomas Pavlopoulos, were Ms. Manzano's brother and her boyfriend. The defendant was apprehended by two Berwyn police officers as he fled the scene of the robbery with a black case containing some jewelry. In the circuit court of Cook County, after the State had read the facts into the record, the trial judge found the defendant guilty of the murders of Danilo Rodica and Thomas Pavlopoulos,

the attempted murder of Linda Manzano, and the armed robbery of the jewelry store. The trial judge, at the conclusion of the death sentencing hearing, imposed the death sentence for the two murders and two 30-year concurrent prison terms for the attempted murder and the armed robbery. This appeal comes directly to this court from the circuit court pursuant to our Rule 603 (87 Ill. 2d R. 603).

On July 31, 1980, the defendant waived his right to a jury trial. The defendant also changed his plea from not guilty to guilty on that day. Subsequent to the imposition of the sentences in this case, the defendant moved to withdraw his guilty pleas. The defendant contended that he had not received the admonishments that are required by our Rule 402 (87 Ill. 2d R. 402). The defendant contended that the judge had no basis upon which to determine that his pleas were entered voluntarily or whether he understood the nature of the charges against him. The trial judge denied the defendant's motion. On appeal before this court, the defendant asserts 12 issues which he believes constitute reversible error and grounds for reversal of his convictions and require a new trial. We do not agree with defendant's assertion on any of the 12 issues he raises and therefore affirm his convictions and the sentences which were imposed.

On Sunday, February 10, 1980, Danilo Rodica, his nine-year-old daughter Joann, and Laura Landsinger all arrived at the Empire Jewelry Store at approximately 11 a.m. to open the store for business. At 1:30 p.m., the defendant entered the jewelry store wearing a beige trench coat, a light blue jogging suit, and dark sunglasses. The defendant asked Laura Landsinger to show him some men's diamond rings in the various display cases. In each instance, Laura would show the defendant the ring and inform him of the size of the diamond and the price. The defendant went from display case to dis-

play case inquiring as to the price of numerous items. Two other customers entered the store and Laura went to wait on them while the defendant continued to look at the display cases. Laura was putting new batteries in the customers' watches when she glanced up and saw that the defendant was no longer in the store.

At approximately 4 p.m., Linda Manzano, the proprietor of the jewelry store, and her boyfriend, Tom Pavlopoulos, came into the jewelry store. Linda and Tom had gone to the store that day because Tom's cousin, Evelyn Pavlopoulos, was coming to the store to buy a gift for her boyfriend. Linda waited on Evelyn and Evelyn left with her purchase. Linda and Tom, at Tom's suggestion, decided to wait until closing time and all leave together.

Between 4:30 and 5 p.m., the defendant again came into the store. He was now dressed in a light brown shirt, a brown vest, a thin brown tie, and the beige trench coat he had worn earlier when he had come into the store. He was carrying a brown leather and tweed briefcase. When the defendant entered the store, he walked over to counter number one, which was located in the rear of the store. Both Laura and Linda were standing behind that counter. Joann was in the back of the store sitting on a stool behind a shelf. Danny and Tom were standing near the desk and the safe in the rear northeast corner of the store. Linda asked the defendant if she could help him, but he requested that Laura wait on him and show him a ring in counter number one. Laura showed the defendant the ring he demonstrated an interest in. The defendant again asked to see several other diamond rings and inquired as to their size and value. Tom walked to the front of the store and sat on a heater. Linda began to wait on defendant when Laura was not sure about the prices of some of the rings. Linda showed defendant about eight rings. The defendant inquired whether it would be possible for him

to pay with a check. Laura told the defendant that he could pay with a check if he had a driver's license. Danny interjected that because it was Sunday and the banks were closed there was no way for the bank to certify the check and therefore that a check would not be accepted. Linda suggested that the defendant pay with a charge card, but the defendant stated that he could not because he had already charged too much on his credit cards. Tom signaled Linda to hurry up and finish waiting on the defendant because it was getting late and they should close up. Linda explained that they were about to close and asked the defendant to come back on Monday.

As Linda was speaking to the defendant, he reached inside his coat and pulled out a .32-calibre blue steel revolver and pointed it at Linda and Laura. The defendant announced that it was a "stick-up" and that nobody should move. At the defendant's insistence, Tom came over to where Laura and Linda were standing. The defendant put the gun in his left hand and also held the briefcase he had brought with him in that hand. He rested the briefcase on the counter, reached over the counter, and began removing diamond rings and putting them in the case. The defendant did this many times until he could not reach any more rings. The defendant then ordered Linda to hand him the rings and watches from the display case. Linda followed his command and gave him all the jewelry he pointed out. The defendant then walked backwards toward the door with his gun still pointed at all of them. He warned them that they should not do anything because he had two "coke" dealers waiting outside.

The defendant left the store, carrying the briefcase with the jewelry in it. Linda Manzano watched the defendant after he left the store. She did not lose sight of him. Linda saw two men waiting outside for the defendant. The defendant was speaking to them; then he

came back into the jewelry store. He stepped half-way into the store and again warned everyone that he had company outside and they should not move. The defendant told them that they should not do anything foolish because the two men outside could blow up the place. He then stepped out of the store.

Laura moved around the shelf to the rear of the store where Joann Rodica was sitting on a stool. A few minutes later she looked through a one-way mirror and saw the defendant reenter the store for the third time. The defendant was carrying another briefcase when he came back into the store. This briefcase was black. Defendant ordered Linda to put the remaining rings from display counter number one into the briefcase. After Linda finished putting the jewelry into the case, the defendant waved his gun sideways, ordering Linda, Tom and Danny to move together. Neither Tom nor Danny moved. After the defendant ordered them to move many times, Linda took one step backwards.

After Linda stepped back, the defendant shot her in the abdomen from approximately 5 feet. Linda fell backwards and Tom and Danny moved towards the defendant. Laura heard the first shot and pushed Joann under a shelf in the back of the store. Laura stayed in back and pushed the hold-up button. Linda saw Tom and Danny struggling with the defendant. Tom grabbed the defendant's gun hand and Danny jumped on the defendant's back. Linda saw the defendant's hand slip from Tom's grip, heard a shot and saw her brother fall down, knocking over a display counter.

Two more shots were fired and Tom was still struggling with the defendant. Linda jumped on defendant's back, scratched his face, and pulled him away from Tom. The defendant shot Tom and pushed Linda to the ground. The defendant went over to Tom. Tom had stopped moving. The defendant then saw Danny's body

convulsing. Linda testified that the defendant pointed the gun at Danny and shot him again.

The defendant jumped over the counter and ran to the rear of the store where Laura and Joann were hiding. Joann testified that she could hear her aunt Linda screaming. The defendant pointed his gun about 18 inches from Laura's face and yelled at her, demanding to know where his briefcase was located. Linda testified that Laura shouted, "Please don't kill me, don't shoot me." Linda heard a "click." The defendant then jumped over Danny's body and ran out of the store.

There were two witnesses, Kathleen Denwood and David Dyrek, who were shopping in Cermak Plaza on the day of the robbery. After seeing the defendant in the jewelry store with a gun, they ran into the Walgreen's store. The couple asked Nina Beck, a salesclerk at Walgreen's, to call the police. Nina ran over to the camera department and told Julie Osisco, a co-worker, to call the police. Nina, David and Kathleen could see into the jewelry store from where they were standing in Walgreen's. Nina testified that she could see the defendant waving his gun back and forth and Linda Manzano putting jewelry into a briefcase. Nina saw what she described as "kind of like a fighting or struggling scene" in the jewelry store. She then heard a "ping" sound and saw that the bottom of the jewelry store door had a hole in it and was cracked. Nina testified that she could see two bodies on the floor of the jewelry store. She saw the defendant leave the store and meet two Berwyn police officers out in front.

Officer Joseph Majchrowicz testified that he was the first one to arrive at the scene of the robbery. According to his testimony, he received a radio dispatch that an alarm was activated at the Empire Jewelry Store in Cermak Plaza. The officer was driving his car in the rear of the plaza when he got the radio message. He pulled his

car behind the store and started walking towards it when he heard a second dispatch that there was a robbery in progress in the store. The officer testified that he could see into the store and that he could see the defendant holding a briefcase. He could see four other persons standing behind a counter. Some bystanders came screaming over to him to tell him there was a robbery in progress and that the defendant had a gun. While the officer was advising the bystanders to leave, he heard several shots. The defendant then came running out of the store. Officer Majchrowicz saw the defendant turn around the corner of the building and come towards him. The officer announced that he was a police officer and told the defendant to stop. The defendant stopped in front of the officer and began to take his hand out of his pocket. The officer advised him not to make any sudden moves and to slowly take his hand out of his pocket. The defendant looked around and began running, turning the corner and running westbound through the plaza. The police officer chased the defendant for about 20 feet when he saw another policeman coming from the opposite direction.

Officer O'Leary, responding to the same radio dispatch as Officer Majchrowicz, was running towards the store when he saw the defendant turn the corner. The defendant was carrying a black briefcase. Majchrowicz stopped chasing the defendant when he saw O'Leary, with his gun drawn, running toward the defendant. O'Leary ordered the defendant to stop and put up his hands. The defendant was placed against the window of the jewelry store and he dropped the briefcase. One of the officers patted down the defendant and found a blue steel revolver in his pocket.

After taking the gun from the defendant, O'Leary put it in his pocket. Officer Majchrowicz handcuffed the defendant, and he was taken to O'Leary's squad car,

where he was read his rights. O'Leary emptied the defendant's gun and found six spent cartridge casings. After O'Leary read the defendant his rights, the defendant said, "I shot them because they started to fight with me."

Officer Majchrowicz went into the jewelry store while the defendant was taken to O'Leary's car. Majchrowicz saw two males with bullet wounds lying on the floor of the store. Majchrowicz called for two ambulances. Linda Manzano ran towards Majchrowicz from the rear of the store. Majchrowicz tried to calm her down, but he described his efforts as "useless."

Two ambulances came to the scene and both bodies were removed. Many officers and evidence technicians began arriving. Linda Manzano showed Detective Dedek the bullet wound to her stomach. Dedek instructed another officer to take her to the hospital. The police had a difficult time getting her to leave, but they ultimately got her into a police car and took her to MacNeal Hospital.

Detective Dedek went to the rear of the store and saw Laura Landsinger and Joann Rodica. Joann was still hiding under the shelf. Dedek told Laura to be certain Joann was kept in the back of the store until the ambulances left.

When Linda Manzano arrived at MacNeal Hospital, surgery was performed. Doctor Maganini removed a bullet from the upper quadrant of her abdomen and gave it to Detective Bultas. Linda was hospitalized for nine days, but was given permission to attend the wakes of her brother and boyfriend.

After she was released from the hospital, Linda Manzano went to the Berwyn police station to view a lineup. During the viewing, Linda stated, "You killed my brother." The defendant turned and said, "Get that bitch out of here." Linda again said, "You killed my brother."

The defendant said, "So what. It should have been your mother."

The information in this case charged the defendant with 18 offenses. The information included six murder charges, two charges of attempted murder, four armed-robbery charges, four aggravated-battery charges, and two armed-violence charges. On the day the trial was scheduled to commence, the State on its own motion moved to nol-pros five counts of the information, one charging attempted murder, two charging aggravated battery, and two charging armed violence. The defendant then was asked whether he wanted a jury trial or a bench trial.

During the colloquy between the trial judge and the defendant prior to his waiving a jury trial, the judge explained that the defendant's decision to waive a jury was one of the most important decisions he would make in his life. The judge asked him if he understood the severity of the charges against him. The defendant said he understood. The defendant then signed a jury waiver in open court.

The jury waiver was followed by a short recess requested by the defendant's attorneys. When court reconvened, defense counsel informed the court that defendant had decided to change his plea to guilty. Defense counsel explained that during the recess the defendant had spoken to his sister and his mother. He also stated that he and his co-counsel had informed the defendant that by pleading guilty the State would probably seek the death penalty. Defense counsel stated:

> "*** But we do feel now, because of the fact, I should say, that those five counts for which we felt there was a defense and for which there were motions which had been heard and denied by this Court and those counts are no longer pending that in regard to the actual guilt or innocence phase of this hearing or of this case there will

be—no useful purpose would be served by proceeding with an actual denial of guilt in regard to the pending charges before this Honorable Court.

* * *

We have at length, with the Court's permission, advised the defendant of the consequences. We understand it does not preclude in our opinion from the State proceeding in whatever fashion they feel is appropriate but we feel under the circumstances we have no reasonable alternative other than what I have indicated to this Court.

Is that correct, Walter?

THE DEFENDANT: Yes, sir."

The State suggested that the court recess for lunch and take the plea after the lunch period. The trial judge agreed and explained that he wanted to "advise Mr. Stewart of certain possibilities in connection with this case, that he may wish to consider over the lunch hour." The judge advised the defendant that on a plea of guilty in a bench trial, he (the judge) would hear a statement from the prosecutors regarding the facts of the case and that, if the defendant and his lawyers agreed, there would be a finding of guilty and a judgment of guilty on those findings. The judge asked if the defendant understood. The defendant said he did. The judge further explained that the State could seek the death penalty. The judge told the defendant that if the State sought the death penalty it would have to prove beyond a reasonable doubt that the defendant was 18 years of age and that there were certain aggravating factors that would qualify him for the imposition of the death penalty. The judge further informed him that he had a right to a jury trial in both stages of the sentencing hearing.

After the lunch recess, the defendant was asked if he still wished to insist in his plea of guilty. The defendant expressed his continued desire to plead guilty.

The State then proceeded in its presentation of the

statement of facts. Upon the conclusion of the prosecutor's recital of the factual basis for the guilty plea and the entry of the court's findings of guilt, the State requested a death penalty hearing, at which time the trial judge explained to the defendant that he could have a jury decide on the death sentence. The defendant waived a jury at the sentencing stage of the trial. At the conclusion of the sentencing hearing, the trial judge sentenced the defendant to death for the murders of Danilo Rodica and Thomas Pavlopoulos and two 30-year concurrent prison terms for the attempted murder and armed robbery.

## ADMONITIONS

On appeal before this court, the defendant asserts that the guilty-plea proceedings did not comply with the requirements of either due process or our Rule 402 (87 Ill. 2d R. 402), since the trial judge allegedly failed to admonish the defendant of the nature of the charges to which he pled guilty, to adequately advise him of the minimum and maximum sentences, and to determine whether his guilty plea was entered voluntarily. The State maintains that, since the trial judge substantially complied with Rule 402, the guilty-plea proceeding did not violate the defendant's right to due process of law.

Rule 402(a) requires substantial compliance with the following in hearings on pleas of guilty:

"(a) Admonitions to Defendant. The court shall not accept a plea of guilty without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
(1) the nature of the charge;
(2) the minimum and maximum sentence prescribed by law including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; [and]
***
(4) that if he pleads guilty there will not be a trial

of any kind, so that by pleading guilty he waives the right to a trial by jury and the right to be confronted with the witnesses against him." 87 Ill. 2d R. 402(a).

Rule 402(b) provides in part:

"Determining Whether the Plea is Voluntary. The court shall not accept a plea of guilty without first determining that the plea is voluntary. *** The court, by questioning the defendant personally in open court, shall confirm the terms of the plea agreement, or that there is no agreement, and shall determine whether any force or threats or any promises, apart from a plea agreement, were used to obtain the plea." 87 Ill. 2d R. 402(b).

Rule 402 was adopted in response to the requirement of *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709, that a guilty plea not be accepted in the absence of an affirmative showing in the record that the plea was intelligent and voluntary. See 87 Ill. 2d R. 402, Committee Comments.

In *People v. Krantz* (1974), 58 Ill. 2d 187, 192, this court, in reference to Rule 402, held:

"We note first the rule requires that there need be only substantial, not literal, compliance with its provisions. (*People v. Mendoza,* 48 Ill. 2d 371, 373-374.) Also, the entire record may be considered in determining whether or not there was an understanding by the accused of the nature of the charge. *People v. Doyle,* 20 Ill. 2d 163, 167; *People v. Harden,* 38 Ill. 2d 559, 563, *aff'd People v. Harden,* 78 Ill. App. 2d 431, 444-445."

In *McCarthy v. United States* (1969), 394 U.S. 459, 22 L. Ed. 2d 418, 89 S. Ct. 1166, the court held that a trial judge, before a plea of guilty is accepted, must, in accordance with Rule 11 of the Federal Rules of Criminal Procedure, make a personal inquiry of the defendant to determine if he understands the nature of the charge against him. In *People v. Mims* (1969), 42 Ill. 2d 441, this court commented on the holding in *McCarthy.* In *Mims,* it was said that *McCarthy* "emphasizes the importance of per-

sonal inquiries addressed to the defendant to ascertain directly his understanding of the nature of the charge against him. And although that decision was 'based solely' upon the Supreme Court's construction of Rule 11 *** the underlying reasons apply equally to Rule 401 [predecessor to Rule 402] of this court." 42 Ill. 2d 441, 444.

The indictment in *Mims* charged the defendant with murder and involuntary manslaughter. The defendant changed his plea and pleaded guilty to the charge of murder. One of the defendant's attorneys described the advice that he gave the defendant as to the possible consequence of his plea and informed the court that the defendant still wished to plead guilty. The trial judge informed the defendant that by pleading guilty he would waive his right to a jury trial and informed him of the possible penalties that could be imposed. The defendant still persisted in his plea. There was no formal inquiry made of the defendant as to whether he understood the nature of the charge, but this court affirmed the conviction, holding:

> "The recital of the anticipated testimony of the witnesses for the prosecution, in the presence of the defendant and his attorneys, without protest and indeed with acquiescence, demonstrates to our satisfaction that the defendant's conduct falls within the charge to which he pleaded guilty." 42 Ill. 2d 441, 444.

In the instant case, the State maintains that the record sufficiently shows defendant's understanding of the nature of the charges because even his own counsel stated that he had "at length, with the court's permission, advised the defendant of the consequences" of his guilty plea. We believe that the record demonstrates that the defendant understood the nature of the charges because he changed his plea in response to the State's nol-prossing the counts to which he claimed he had defenses, which indicates that the defendant and his attorneys, who were present through the entire proceeding, understood the nature of the re-

maining charges. Further, as this court held in *Mims*, the defendant and his attorneys did not protest and indeed acquiesced in the recital of the State's statement of facts which demonstrated that the defendant's conduct fell within the charges to which he pleaded guilty.

At this juncture, it is also important to note that the defendant does not contend that he did not understand the nature of the charges to which he pleaded guilty or that he is not guilty. Rather, he maintains that the trial judge erred in not explaining the nature of the charges.

The defendant was represented by two attorneys throughout the entire proceeding. At the arraignment, the information was read aloud in open court in front of the defendant. We therefore believe that the record demonstrates that the defendant understood the nature of the charges against him.

The defendant also contends that he should have been admonished as to the minimum and maximum prison sentences he could have received. The trial judge did fully admonish the defendant regarding the possibility that he might receive a death sentence. In fact, most of the admonishments were aimed at making that clear. The trial judge also admonished the defendant that it was his right to have his case heard by a jury. He told the defendant that he had the right to have the question of the death sentence heard by a jury also.

Understandably, no claim is made that the defendant, represented by counsel, was unaware of the possible punishment to which his conduct had exposed him. No complaint of any defect in the trial court's admonition regarding sentencing was made during the proceeding in this case. Our Rule 402 was designed to insure properly entered pleas of guilty, not to provide for a recital of all the possible sentencing situations that might arise. The defendant was made aware and said he understood that he might receive the death penalty; obviously, as that is the ultimate

penalty, any sentence short of that was a possible lesser sentence. We are not persuaded that the trial judge failed to substantially comply with Rule 402 because he did not ceremoniously inform the defendant of all the lesser sentences which could possibly be imposed.

We are not persuaded by the defendant's argument that the record does not indicate that his plea was voluntary. There is no evidence in the record that he was pressured or forced to enter a guilty plea. The judge went out of his way to explain that by entering a guilty plea he would not be entitled to a lesser penalty, that he was giving up his right to an actual trial, including the right to confront and cross-examine witnesses. The judge repeatedly asked the defendant if he understood what he was telling him. The defendant never told the judge he did not understand; he said he did understand. We have no reason to believe that the defendant was not telling the truth.

The State argues that the defendant knew what he was doing in pleading guilty in this case because he was no stranger to the criminal justice system. We do not agree with the State's assertion. Just because a defendant has pleaded guilty or not guilty on other charges does not persuade us that he necessarily pleaded guilty voluntarily in this case. We are, however, persuaded by the entire record that the defendant did voluntarily plead guilty.

## ASSIGNMENT OF ASSOCIATE JUDGE

Defendant contends that the trial judge, as an associate judge, lacked jurisdiction to preside over his case or to impose the sentence of death. The State maintains that the judge was not precluded from handling the case because the assignment provision of our rules was applied properly, that defendant waived the issue because, as a nonjurisdictional issue, it was waived when he failed to raise it in the trial court, and, lastly, that even if the assignment was improper and defendant did not waive the issue, any error

was harmless since judgments entered in technical violation of the assignment provision are not void. The State also asserts that a court, not an individual judge, has jurisdiction over a case.

Rule 295 of our rules (87 Ill. 2d R. 295) provides in pertinent part:

> "Upon a showing of need presented to the supreme court by the chief judge of a circuit, the supreme court may authorize the chief judge to make temporary assignments of individual associate judges to conduct trials of criminal cases in which the defendant is charged with an offense punishable by imprisonment for more than one year."

In this case, there is evidence in the record that this court authorized the temporary assignment of the presiding associate judge. Therefore, the issue becomes whether cases in which the death penalty is a possible sentence are within the category of cases punishable by imprisonment for more than one year so that they can be assigned to an associate judge under our Rule 295. We believe Rule 295 applies to the instant case for two reasons. First, the Rule states that it applies to ·cases in which a defendant is charged with an offense punishable by imprisonment for more than one year. This language clearly applies to the instant case where the defendant faced a possible prison sentence for more than one year. We do not agree with defendant that because the rule does not specifically include capital cases it excludes them. Second, there is no sure way to know in advance of trial which felony cases are cases in which the death penalty will be imposed. It is true that some cases may seem to be cases in which the death penalty is more likely to be imposed, but as we have seen in the past, mitigating factors can be sufficient to preclude the imposition of death even in a case where it would seem more certain that the death penalty would be imposed. In assigning these cases there is no cut and dried way to determine in which cases the State will seek the

death penalty. Therefore, we hold that, since this court authorized temporary assignment of this judge and the defendant faced a possible sentence of imprisonment for more than one year, this case clearly lies within the purview of our Rule 295 and the trial judge was not precluded from presiding over and imposing sentence in this case.

## MENTAL EXAMINATION

Defendant contends that the trial judge improperly denied his request for a mental examination in conjunction with the presentence report that was ordered. The defendant contends that the judge abused his discretion in denying his request and that his constitutional rights were therefore violated. The State maintains that the judge did not abuse his discretion because defendant's request for the mental examination was untimely and inconsistent with the purpose of the statute because no disposition of imprisonment was indicated.

Mental examinations are explicitly authorized by statute. (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—3—2(b), 1005—3—3.) Section 5—3—2(b) provides that such an examination should be performed "[i]f the court determines that such an examination should be made ***." (Ill. Rev. Stat. 1981, ch. 38, par. 1005—3—2(b).) Section 5—3—3 states that "In felony cases *where the court is of the opinion that imprisonment may be appropriate ***"* (emphasis added), a mental examination may be ordered to determine what rehabilitative resources or programs might be adaptable to a particular defendant's needs. Ill. Rev. Stat. 1981, ch. 38, par. 1005—3—3.

We believe, in this case, there was no indication that such an examination should be made, and we therefore do not believe that the trial judge abused his discretion. The defendant asserts that these examinations are relevant in a death penalty hearing for three reasons. First, to determine if there is the existence of any statutory mitigation

such as the fact that the defendant was acting under the influence of an extreme mental or emotional disturbance. Second, to demonstrate the existence of nonstatutory mitigation involving the defendant's character, personality or psychological makeup. Third and last, to determine if the defendant has rehabilitative potential.

It is important to note that while we agree that these three reasons are valid reasons to conduct a mental examination, there must be, in the discretion of the judge, some indication that evidence of these mitigating factors and rehabilitative potential might be present. The defendant cites *People v. Carlson* (1980), 79 Ill. 2d 564, and *People v. Gleckler* (1980), 82 Ill. 2d 145, to support his contention that a mental examination should also have been ordered in the instant case. In both of those cases, however, the defendant's mental state was an issue at trial. In *Gleckler,* a psychologist's and a psychiatrist's testimony was presented during Gleckler's case in chief in support of his alleged compulsion defense. Gleckler was an alcoholic with no prior criminal record. In *Carlson,* the defendant raised an insanity defense at trial. These two cases are clearly distinguishable from the instant one where the defendant had not presented any evidence to demonstrate that his mental condition was abnormal at any time.

We cannot say that the trial judge abused his discretion in denying the defendant's request for a mental examination along with the presentence report when there is nothing in the record to indicate that the defendant's mental condition was at issue. The defendant's assertion now that he had an "unstable childhood" is belied by the record. We will not vacate a sentence on speculation of what a mental examination may have indicated when a judge in his discretion refused to order that examination believing that the defendant failed to raise the issue of his mental condition. The defendant presented witnesses in mitigation, none of whom indicated that he had any mental problems.

## ALLEGED LATE DISCLOSURE OF
## PRESENTENCE REPORT

Defendant contends that the trial court failed to comply with section 5—3—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—3—4) by failing to disclose the presentence report three days in advance of the imposition of his sentence and in allowing the sentencing hearing to begin before the completion of the presentence report.

Section 5—3—4(b)(2) requires that the presentence report *"shall be open for inspection* *** at least 3 days prior to the imposition of sentence, unless such 3 day requirement is waived."* (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 38, par. 105—3—4(b)(2).) The report does not actually have to be tendered to defense counsel three days before the imposition of sentence. (*People v. Grant* (1979), 70 Ill. App. 3d 268.) In the instant case, the social investigation report was certified as of August 5, 1980, three days before the defendant was sentenced on August 8, 1980. The report was therefore open for inspection three days before sentencing, even though defendant was not actually tendered the report until August 6, 1980, two days before sentencing. We believe that section 5—3—4 was complied with in this case.

We do not find any language in section 5—3—4 or any authority for the defendant's assertion that commencement of a sentencing hearing is prohibited until a presentence report is completed. We therefore hold that the defendant's contention is without merit.

Since we have determined that section 5—3—4 was complied with, it is unnecessary for us to address defendant's next argument that the evidence contained within the report should not have been considered. Furthermore, neither defendant nor his counsel ever objected to the contents of the report.

## EFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that he was denied effective assistance of counsel and cites three examples of his counsel's alleged incompetency. First, he asserts that his counsel should have requested $250 for the purpose of obtaining expert psychological evidence. Second, he contends that his counsel should have insured that the court had an accurate picture of his prior record. And thirdly, the defendant maintains that his counsel failed to adequately investigate his statement that he suffered from a drug problem.

In Illinois, a single standard is now employed to determine the ineffective assistance of counsel. (*People v. Royse* (1983), 99 Ill. 2d 163.) The competency of counsel is presumed and can only be overcome by strong and convincing proof of incompetency. (*People v. McCraven* (1981), 97 Ill. App. 3d 1075, 1077.) The defendant bears the burden of establishing his trial counsel's actual incompetence as reflected in the representation and substantial prejudice resulting therefrom. *People v. Witherspoon* (1973), 55 Ill. 2d 18, 21.

We do not agree with defendant that his counsel's failure to request money under section 113—3(d) (Ill. Rev. Stat. 1981, ch. 38, par. 113(d)) establishes ineffective assistance of counsel. Since defendant's request for a mental examination had already been denied, it was not unreasonable for defense counsel to assume that a request for funds to obtain expert testimony would similarly be denied. Furthermore, we cannot assume that the decision not to request the funds was not a tactical decision on the part of defense counsel. Defense counsel may have decided that expert testimony might in fact be more damaging than helpful to defendant's case. In any event, our review of the competency of counsel does not extend into areas involving the exercise of judgment, discretion, or trial tactics by counsel, even though appellate counsel and this court

might have decided differently. See *People v. Martin* (1970), 44 Ill. 2d 489; *People v. Smith* (1980), 81 Ill. App. 3d 764.

Defendant has failed to meet his burden of establishing by strong and convincing evidence that counsel's failure to request funds for expert testimony is proof of his incompetence.

We likewise do not agree with defendant that, because defense counsel did not *insure* that the judge was aware that his 1969 robbery offense and his 1973 offense were disposed of by placing the defendant on supervision and did not elicit information relating to defendant's statement that he had a drug problem, he was denied effective assistance of counsel. It is pure speculation that defense counsel's failure to investigate the defendant's alleged drug problem caused the defendant to suffer substantial prejudice therefrom.

The issue of incompetency of counsel is to be determined from the totality of counsel's conduct. (*People v. Murphy* (1978), 72 Ill. 2d 421, 437.) After a careful review of the entire record, we conclude that the defendant has failed to sustain his burden of establishing that his counsel was incompetent. At all times both attorneys that represented the defendant vigorously defended him and exercised a high degree of skill and care.

## MITIGATING FACTORS

The defendant asserts three reasons why the trial judge inappropriately determined that there were no mitigating factors sufficient to preclude the imposition of the death sentence. The three reasons are as follows: (1) that the judge improperly considered prior adjudications of delinquency in rejecting the mitigating factor that defendant had no significant history of prior criminal activity; (2) that the judge incorrectly considered a juvenile disposition which did not result in an adjudication of delinquency and

an adult disposition that did not result in a conviction in rejecting the mitigating factor of no significant history of prior criminal activity; and (3) that the judge erred in failing to give any weight to important mitigating factors.

The defendant asserts that the legislature did not intend to include delinquency findings on the question of whether a defendant in a capital murder case has a significant history of prior criminal activity because delinquency findings are not "criminal" activity. The alleged error involves the trial judge's consideration of defendant's delinquency findings for his 1970 robberies where he used a zip-gun rifle and bayonet to take a watch and billfold from one victim and a 1969 Dodge from another one. We do not agree with defendant that consideration of these two delinquency findings constitutes reversible error. In *People v. Powell* (1973), 53 Ill. 2d 465, 479, this court held that a defendant's prior juvenile record may properly be considered in the aggravation and mitigation hearing.

In regards to the second reason the defendant raises, we believe that consideration of both the 1969 juvenile robbery proceeding that did not result in an adjudication of delinquency and the 1973 theft charge that did not result in conviction did not constitute reversible error. Even if these two dispositions were improperly considered by the trial judge, the error was harmless because the defendant still had a significant history of criminal activity; *i.e.,* convictions for two burglaries, misdemeanor theft, possession of a controlled substance, and two for unlawful-use-of-weapons charges.

The defendant's assertion that the trial judge failed to consider or improperly considered certain factors in mitigation is without merit. Because the judge concluded that there was "nothing to mitigate the offense committed here" does not mean, as the defendant asserts, that the judge failed to give weight or improperly weigh any factors in mitigation. The judge stated, "I have indulged in many

hours of reflective introspection seeking to find some factors in mitigation. *** I have searched my conscience and my soul and I cannot find any basis in law or in fact that would preclude the death penalty in this case." We do not agree with defendant that the record demonstrates that the judge did not consider or failed to appropriately weigh factors in mitigation.

## CONSTITUTIONALITY OF THE DEATH PENALTY STATUTE

The defendant raises four issues alleging that the Illinois death penalty statute (Ill. Rev. Stat. 1981, ch. 38, par. 9–1) is unconstitutional. All four of the defendant's contentions have been raised and rejected by this court. We will therefore not address them in this opinion.

## MULTIPLE COUNTS FOR MURDER

Defendant contends that the trial judge found him guilty of six counts of murder and that his convictions should be vacated since he only murdered two people.

The State maintains that, since the final judgment in any criminal case is the sentence, defendant's argument is without merit because the sentence of death was imposed in this case for the two murders of Danilo Rodica and Thomas Pavlopoulos.

In *People v. Wilfong* (1960), 19 Ill. 2d 406, 408, this court stated that "where it is clear that they [different offenses] grow out of the same act or transaction, separate and distinct offenses may be charged in the same indictment and stated, in different ways, in as many counts as necessary."

It is clear from the judge's pronouncement of sentence that the defendant was found guilty and sentenced for two murders only. The judge stated:

"Walter Stewart, for the murder of Danilo Rodica I sentence you to death. For the murder of Thomas Pavlo-

poulos I sentence you to death."

Later, the judge stated that he had "sentenced the defendant to death for the murder of two individuals. The murder of two individuals committed in the course of a forcible felony, to-wit: armed robbery."

In the instant case, it is clear that the defendant was found guilty of two murders, not six. Therefore, we hold that the defendant was only found guilty on two of the six counts of murder charged in the information.

For all of the foregoing reasons, we affirm the judgment, including the sentence of death of the circuit court of Cook County. Accordingly, the clerk of this court is directed to enter an order fixing Monday, September 24, 1984, as the date on which the sentence of death entered in the circuit court of Cook County is to be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE MORAN, dissenting:

I respectfully dissent from the majority opinion. Due process and our Supreme Court Rule 402 require an affirmative showing, in the trial court record, that a guilty plea has been entered knowingly and voluntarily. (*Boykin v. Alabama* (1969), 395 U.S. 238, 244, 23 L. Ed. 2d 274, 280, 89 S. Ct. 1709, 1713; 87 Ill. 2d R. 402.) Recognizing the constitutional requirement that a plea of guilty must be "intelligent and voluntary," the court in *People v. Reeves* (1971), 50 Ill. 2d 28, 29, stated that "*Boykin* adds the requirement that if the guilty plea is to withstand appellate or post-conviction review 'the record must affirmatively

disclose that the defendant who pleads guilty enters his plea understandingly and voluntarily.' (*Brady v. United States*, 397 U.S. 742, 747 *footnote* (4), 25 L. Ed. 2d 747, 756, 90 S. Ct. 1463, 1468.)"

As the majority points out, Rule 402 was adopted in response to the requirements of *Boykin*. (101 Ill. 2d at 484.) The trial court is always under a duty to substantially comply with the requirements of Rule 402 before accepting a guilty plea. (*People v. Krantz* (1974), 58 Ill. 2d 187, 192.) I cannot agree with the majority that the record shows substantial compliance with the requirements of due process or Rule 402. In particular, I find that the trial court completely abrogated its duty to the defendant to determine if his plea was voluntary. 87 Ill. 2d R. 402(b).

In conformity with the mandates of *Boykin*, our Rule 402(b) specifically addresses the determination of whether a guilty plea is voluntary and requires that the trial court "by questioning the defendant personally in open court \*\*\* determine whether any force or threats or any promises, apart from a plea agreement, were used to obtain the plea." (87 Ill. 2d R. 402(b).) A careful reading of the record in the instant case reveals a complete absence of dialogue between the court and the defendant regarding the voluntariness of the plea. The court in *Boykin* expressly stated that presuming voluntariness from a silent record is impermissible. The court reasoned that "a plea of guilty is more than an admission of conduct; it is a conviction. Ignorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." *Boykin v. Alabama* (1969), 395 U.S. 238, 242-43, 23 L. Ed. 2d 274, 279, 89 S. Ct. 1709, 1712.

The majority, in the case at bar, states that "[t]here is no evidence in the record that [defendant] was pressured or forced to enter a guilty plea." (101 Ill. 2d at 487.) This implies that the burden is on the defendant to prove that his plea was coerced or induced when, in fact, the burden

is on the State to prove that it was voluntary. On the basis of a silent record, this burden cannot be met. While the court is required to inquire as to the voluntariness of the guilty plea, the State, in the absence of such an inquiry, could have aided in the establishment of an adequate record by suggesting this omission to the court. In so doing, the State would have been assured that it could meet the burden of proving voluntariness, if the validity of the guilty plea was challenged on review. As the court stated in *McCarthy v. United States* (1969), 394 U.S. 459, 465, 22 L. Ed. 2d 418, 424-25, 89 S. Ct. 1166, 1170, the dual purpose of Rule 11 (the Federal counterpart to our Rule 402) is to (1) assist the judge in determining that a guilty plea is voluntary, and (2) create a complete record which will reflect the factors necessary to make this voluntariness determination. "By personally interrogating the defendant, not only will the judge be better able to ascertain the plea's voluntariness, but he also will develop a more complete record to support his determination in a subsequent post-conviction attack." 394 U.S. 459, 466, 22 L. Ed. 2d 418, 425, 89 S. Ct. 1166, 1170-71.

I have scrupulously reviewed the record trying to discern any discourse that would indicate that the court ascertained that the defendant was voluntarily entering his guilty plea. This search proved fruitless, revealing neither explicit dialogue concerning the voluntariness of the plea nor inferences that the plea was, indeed, being entered voluntarily. As a result, it is impossible to conclude that the defendant received the admonishments required by our Rule 402 and voluntarily entered his plea of guilty. Therefore, I would vacate the defendant's guilty plea and sentence and remand the cause in order that defendant be allowed to plea anew.

JUSTICE GOLDENHERSH joins in this dissent.

JUSTICE SIMON, also dissenting:

I concur in Justice Moran's dissent. I would like further to note, based on my perusal of the record, the specific respects in which I believe the trial judge failed to admonish the defendant as the law requires. In addition, I dissent from the majority's holding that a death sentence may be validly imposed by an associate judge, and I also believe that the trial judge in imposing the sentence in this case improperly considered certain evidence relating to the defendant's earlier brushes with the law.

## I. THE ADMONITIONS

When the case was called for trial, the charges against the defendant were contained in an 18-count information which included six murder charges, two charges of attempted murder, four armed-robbery charges, four aggravated-battery charges, and two armed-violence charges. On the day the trial was scheduled to commence the State voluntarily moved to nol-pros five counts of the information, as set forth in the majority opinion (101 Ill. 2d at 481). The defendant then waived a jury trial. During the colloquy concerning the jury waiver, the trial judge asked the defendant if he understood the severity of the charges against him but did not explain the nature of any of the charges.

The jury waiver was followed by a short recess requested by defendant's attorneys. When the court reconvened, defense counsel informed the trial judge that the defendant wished to change his plea to guilty. The judge then admonished the defendant that the State might seek the death penalty, that the State would have to prove that the defendant was at least 18 years of age and "that there were certain aggravating factors that qualified" the defendant "for the imposition of the death penalty." The judge followed this up by telling the defendant that the de-

cision he would be called upon to make was probably the most important decision of his life and informed the defendant that he had the choice of having the death sentence hearing conducted before a jury or waiving the jury and having the hearing conducted by the court. Immediately after a luncheon recess the court asked the defendant whether he persisted in the guilty plea or wished to change it, and upon being advised that the defendant still wished to plead guilty the court asked whether he wished him to hear the case, to which the defendant responded in the affirmative. Upon the conclusion of the prosecutor's recital of the factual basis for the guilty plea and the entry of the court's findings of guilt on 11 counts, the State requested a death penalty hearing, at which point the trial judge again informed the defendant he could elect to have a jury decide on the death sentence. All of these proceedings were completed in one day.

Nowhere in the transcript is there any statement by the trial judge which informed the defendant of the nature of the charges which remained after the elimination of five of the 18 counts. The judge's failure in this respect was especially serious in view of the confusion which might have been caused by the prosecutor's reference to the charges which were being eliminated.

The only time the indictment was read to the defendant was at the arraignment, more than five months before entry of the guilty plea. At that time he received no judicial admonition to pay heed to the charging instrument and no inquiry was made regarding his understanding of it, as he was then not voluntarily or knowingly attempting to waive any constitutional rights.

The defendant in this case, through his attorney, entered a "general plea of guilty," in the words of the attorney, to "whatever [was] still left" in the information. But the trial judge neither told the defendant what counts were "still left" nor informed him of the nature of the charges

to which his general plea was entered. Not only did the judge fail to explain the nature of the remaining charges, he did not even refer to them by name. The record in this case is lacking in any affirmative showing that at the time the defendant entered his plea he was either informed of or understood the nature of the murder, attempted-murder, armed-robbery and aggravated-battery charges to which his plea was directed. There might even have been some confusion on the part of the prosecutor, evidenced by the fact that upon completing his recital of the factual basis for the plea he asked that two of the aggravated-battery counts merge into an attempted-murder charge.

As both the majority (101 Ill. 2d at 484) and Justice Moran's dissent (101 Ill. 2d at 497) observe, Rule 402 was adopted in response to the requirement of *Boykin v. Alabama* (1969), 395 U.S. 238, 23 L. Ed. 2d 274, 89 S. Ct. 1709, that a guilty plea not be accepted in the absence of an affirmative showing in the record that the plea was intelligent and voluntary. (See 73 Ill. 2d R. 402, Committee Comments.) It is a rule that was not made to be disregarded (*People v. Walker* (1981), 84 Ill. 2d 512, 525-26), as the foregoing suggests occurred. Moreover, the record in this case affirmatively reveals that any discussion between the defendant and his counsel concerning the possibility of a guilty plea could not have taken place over an extended period of time. It reflects that these discussions commenced only after the State nol-prossed five of the charges. Following that, there was a short recess during which the defendant spoke to counsel and to his mother and sister over the telephone, and then he returned to court to plead guilty.

The trial judge did fully admonish the defendant regarding the possibility that he might receive a death sentence, as the majority opinion points out (101 Ill. 2d at 486). The trial judge also admonished the defendant that he had the right to have the charges against him heard by

a jury and that by pleading guilty he was waiving that right, and he informed the defendant in addition that he had the right to have his sentence considered by a jury. At no place, however, do I see in the record any statement by the trial judge concerning the minimum and maximum terms of imprisonment the law prescribed, so as to give the defendant some idea of what kinds of punishment short of death he might receive and what he might be in a position to bargain with the State's Attorney for should he withhold his plea of guilty and attempt to renegotiate his plea. In that respect also the requirements of Rule 402(a)(2) were not satisfied.

I am unable to determine from the record whether the plea was entered voluntarily or intelligently. Except for the statements that the death penalty might be imposed, that the defendant had the right to be tried by a jury both with respect to guilt or innocence and with respect to the death sentence hearing, and that at a death sentence hearing the State would be required to prove the age of the defendant and aggravating factors that qualified the defendant for the imposition of the death penalty, there were virtually no admonishments. In addition, there is nothing in the record to indicate that any determination was made that no force, threats or promises had been made to obtain the guilty plea. A further aspect of the hearing on the plea of guilt which I feel is significant to note is that the trial judge did not even admonish the defendant as required by Rule 402(a)(4) that on such a plea he gave up his right to trial and the right to face the persons that made accusations against him, and to hear them testify and to cross-examine them through his lawyer, until at the very end of the hearing the defendant's attorney himself reminded the trial judge that it would be in order to offer those admonitions. When a guilty plea is entered, the question of its voluntariness is a part of the State's case, not an affirmative defense as the majority appears to imply. (See *Boykin v. Ala-*

*bama* (1969), 395 U.S. 238, 243-44, 23 L. Ed. 2d 274, 279, 89 S. Ct. 1709, 1712.) The record that the trial judge allowed to be made is not adequate to enable this court to accomplish the review the law directs when such a plea is entered.

The fact that the defendant was present when the prosecutor read into the record the factual basis for the plea does not persuade me that the defendant understood what he was pleading guilty to at the time he entered his plea. The factual basis was not recited until after the guilty plea had been accepted, and it therefore could not have assisted the defendant in understanding the nature of the charges at the time he entered his plea. In addition, at no time did the defendant concede the accuracy of the factual basis. In fact, no inquiry was ever made of the defendant as to the accuracy of the factual matter the prosecutor read into the record. The defendant's silence at this stage of the proceedings can hardly be equated with an understanding of the nature of the charges.

## II. ASSIGNMENT OF ASSOCIATE JUDGE

I do not believe that a death sentence imposed by an associate judge is valid under Supreme Court Rule 295. (87 Ill. 2d R. 295.) Prior to May 1975 the rule did not authorize associate judges to try criminal cases in which the defendant was charged with an offense punishable by imprisonment for more than one year. Because of the gravity of the matters that would be involved, this court repeatedly refused to alter this rule. Eventually, when the problem of the increased crowding of criminal dockets became so severe that this court believed some relief was imperative, Rule 295 was amended in 1975 to allow the chief judge to make temporary assignments of associate judges to try this additional class of cases. Ill. Ann. Stat., ch. 110A, par. 295, Supplement to Historical and Practice Notes at 249-50 (Smith-Hurd 1982 Supp.).

As we construe the present Rule 295, we must keep in mind the scope of the old rule, the purpose of the change, and the language of the rule as it now stands. Pressure on the trial docket was caused by the combination of the increasing number of new cases and the old rule's prohibition against associate judges trying felonies punishable by imprisonment of more than one year, under any circumstances. In order to balance the important goals of speedy justice for defendants awaiting trial and adequate procedural safeguards for defendants charged with serious crimes and subject to severe punishment, this court changed the rule to allow associate judges *temporarily* to try *some* of the more serious cases. The class of felonies punishable by imprisonment of more than one year is a large one, and this change, as I construe it, goes far toward relieving the bottleneck which developed under the old rule. Associate judges are now free to try many more cases than they could try under the old Rule 295.

However, that is as far as Rule 295 goes. It is a temporary expedient. It does not authorize associate judges to try all criminal cases, or even all felony cases, on a permanent basis. The language of the rule refers to one class of felony cases only; the rule says nothing about the separate class of felonies punishable by death. These are not the same as felonies punishable by imprisonment of more than one year. It is the maximum penalty available, not the penalty actually imposed in a particular case, which governs. The fact that an individual defendant in a "death case" may ultimately be sentenced to imprisonment of more than one year no more brings death cases within the new Rule 295 than the fact that under the old rule a defendant charged with a crime for which he could be sentenced for more than one year actually received a sentence of less than one year would have made his case one which could be tried by an associate judge. There is no need to know in advance which defendants will ultimately be sentenced to

death. The proper procedure under the current Rule 295 is to prohibit the assignment to an associate judge of any trial of an offense potentially punishable by death.

Our omnipresent concerns about the fairness of the judicial process are intensified in cases in which death is a potential penalty. As I have indicated in a similar situation (*People v. Ruiz* (1982), 94 Ill. 2d 245, 273 (Simon, J., dissenting)), faithful adherence to the letter of the law must be the rule followed in every instance where a final and irreversible punishment is involved. There can be no slippage, no "play in the joints," where a presumably innocent human being's life is at stake. Capital cases are not ordinary cases. We cannot imply procedural shortcuts absent clear and explicit language that these procedures apply to capital cases. There is no indication anywhere in the language of Rule 295, the committee comments, or the supplemental notes, that the special situation of capital cases was considered and included within the rule. There is also no indication that the term "offense punishable by imprisonment of more than one year" is to be given any broader meaning than its plain wording would ordinarily warrant. In short, there is no indication that a narrow grant of authority enacted solely to address pragmatic concerns and even then conditioned "upon a showing of need" (87 Ill. 2d R. 295) should be so dramatically expanded to include the most grave of all sanctions, the judicially authorized taking of life.

In capital cases, where the stakes to the defendant are so high, we must be concerned that not even the slightest possibility of any unauthorized procedure will be allowed. A clear expression from the supreme court that associate judges are eligible to impose death sentences is what is required and that is missing here.

### III. EVIDENCE OF EARLIER MISCONDUCT

Finally, I believe a serious error occurred at the sen-

tencing stage which requires a remand for a new sentencing hearing. The trial judge improperly relied on two of the defendant's earlier contacts with the law in concluding that the death penalty should be imposed. First, he stated for the record that in 1969, at the age of 14, the defendant "was adjudged a juvenile delinquent for robbery." This is a mischaracterization of the incident. The juvenile court's disposition of the petition relating to defendant's conduct at that time was to place the defendant on juvenile supervision without entry of any findings, a disposition which does not constitute an adjudication of delinquency. (*In re A.M.* (1981), 94 Ill. App. 3d 86; see Ill. Rev. Stat. 1979, ch. 37, par. 704—7.) Inasmuch as the defendant was not adjudicated a delinquent on this occasion, this incident could not properly be considered at a later sentencing hearing. Ill. Rev. Stat. 1979, ch. 37, par. 702—9.

Also, the trial judge, in commenting on the defendant's proclivity for crime after he "graduated from the juvenile court," as the judge put it, referred to his conviction for theft in 1973. Here again the trial judge mischaracterized the episode, for that charge too was disposed of by supervision, and this disposition did not constitute a conviction. *People v. Breen* (1976), 62 Ill. 2d 323.

The trial judge referred to these two incidents and others as part of a pattern which revealed, in the judge's words, "proclivity for crime" by the defendant. Inasmuch as neither incident involved an adjudication of delinquency or a conviction, reliance upon them in determining the appropriate sentence was error. This error cannot properly be regarded as harmless, as the State urges, in a case such as this where the sentencing judge's reliance on the two incidents appears so prominently in the record. In *Townsend v. Burke* (1948), 334 U.S. 736, 92 L. Ed. 1690, 68 S. Ct. 1252, where erroneous information regarding a defendant's criminal record was considered in sentencing, the court observed that it was not at liberty to assume that the sen-

tencing court was not influenced by that information. See also *People v. Brownell* (1980), 79 Ill. 2d 508, 535-36.

The majority opinion does not discuss this issue, for it views it as having been waived by the defendant's failure to object to the introduction of this evidence before the trial judge. (101 Ill. 2d at 494-95.) I do not believe that it is appropriate to give such short shrift to a serious objection which a defendant seeks to raise in an attempt to escape execution, a penalty which is irreversible should it later appear that a mistake was made. As I pointed out in my dissent in *People v. Free* (1983), 94 Ill. 2d 378, 435 (Simon, J., dissenting), "few propositions have a longer pedigree in the common law of this State than that any irregularity not *expressly* waived in the trial of a capital case must be heard on review. (*Nomaque v. People* (1825), 1 Ill. (1 Breese) 145, 149; see *People v. Fisher* (1930), 340 Ill. 216, 259.)" Moreover, I believe that the error alleged here was so substantial and cut so deeply into the fairness of the proceeding as to call for its treatment as plain error. (87 Ill. 2d R. 615(a); see *People v. Whitlow* (1982), 89 Ill. 2d 322, 342; *People v. Roberts* (1979), 75 Ill. 2d 1, 14; *People v. Sullivan* (1978), 72 Ill. 2d 36, 42; *People v. Burson* (1957), 11 Ill. 2d 360, 370-71; compare *People v. Baynes* (1981), 88 Ill. 2d 225, 233-34, 244 (admission of polygraph evidence ruled plain error even though defendant had stipulated to it at trial).) The trial court's misreading of the character of defendant's earlier antisocial conduct derives no support from the evidence, and its use for the purpose of establishing his tendency to commit serious crimes notwithstanding that fact deprived him of the substantial means of receiving a fair sentencing hearing.

For the foregoing reasons I dissent.