Donald **THIGPEN**, Petitioner-Appellant,

v.

Fred **SMITH**, et al.,
Respondents-Appellees.

No. 85–7264.

United States Court of Appeals,
Eleventh Circuit.

June 20, 1986.

Rehearing and Rehearing En Banc
Denied Aug. 7, 1986.

See also 277 So.2d 922, 50 Ala.App. 176, 355 So.2d 400, 374 So.2d 401.

Stanley A. Teitler, New York City, for petitioner-appellant.

Ed Carnes, Asst. Atty. Gen., Montgomery, Ala., for respondents-appellees.

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

I.

On May 5, 1972, Donald Thigpen was convicted of first-degree murder by a jury in the Circuit Court of Jefferson County, Alabama, for the slaying of Cassie Lee Davis. Thigpen was sentenced to death, but, on appeal, the Alabama Court of Criminal Appeals reduced the sentence to life imprisonment. *Thigpen v. State*, 50 Ala. App. 176, 277 So.2d 922 (Ala.Crim.App. 1973).[1]

On April 16, 1975, while serving his life sentence, Thigpen and ten other inmates escaped from Holman Prison, located in Escambia County, Alabama. The next day Thigpen and another escapee, Pedro Williams, came across a sixty-eight-year-old farmer, Henry Lambeth, who was driving fence posts along a road. Lambeth's pickup truck was parked nearby. One of the two escapees brutally assaulted and killed the farmer, either with a fence post or an ax he retrieved from the pickup truck. Thigpen and Williams then carried the body to an abandoned farm house. A few hours later, the police spotted the two escapees driving the victim's pickup truck and arrested them. As the officers were taking the escapees into custody, Thigpen identified himself and told the officers that he and Williams had taken the pickup truck from a man who was feeding his cows in a pasture.

Shortly after the arrest, Williams gave a statement to the police. In his statement he said that, following their escape, he and Thigpen spent the first night in the woods. The next morning, as they were walking along a road, they saw a vehicle (Henry Lambeth's pickup truck) approaching, and they hid in some bushes along the side of the road. The vehicle stopped in front of an abandoned farm house, across the road from where the two escapees were hiding. The driver of the vehicle (Henry Lambeth) got out and began unloading some fence

---

1. The Alabama Court of Criminal Appeals acted pursuant to *Hubbard v. State*, 290 Ala. 118, 274 So.2d 298 (1973) which, relying on *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), held unconstitutional the death penalty statute under which Thigpen was sentenced.

posts. At this point, according to Williams, Thigpen crossed the road and asked the man if he needed help. He said he did not, but Thigpen began helping him anyway. When the man turned his back to Thigpen, Thigpen grabbed a fence post or an ax and beat him to death. After the killing, Williams crossed the road and helped Thigpen carry the body to the abandoned farm house, where they left it. They fled the scene in the victim's pickup truck. Williams repeated this statement to the police three days later.

On October 20, 1975, Thigpen was indicted by an Escambia County, Alabama grand jury for first-degree murder. Williams was charged with the same crime in a separate indictment. Williams pled guilty to second-degree murder and was sentenced to prison for ninety-nine years. Thigpen pled not guilty and, after obtaining a lengthy continuance, went to trial on August 16, 1976, in the Escambia County Circuit Court. The trial lasted a day and a half. The State conclusively established that Thigpen and Williams were together at the scene of the crime and that one of them murdered Henry Lambeth with a fence post or an ax,[2] disposed of his body, and stole his pickup truck.

Both Thigpen and Williams testified in Thigpen's defense. Williams took the stand first and recanted the two statements he had given the police to the extent that he reversed the roles he and Thigpen played in the murder. He testified that he, not Thigpen, was the one who emerged from the bushes, crossed the road, and killed the victim. On cross-examination, the prosecutor confronted Williams with his prior inconsistent statements to the police, but Williams would not change his testimony. Thigpen's testimony mirrored what Williams told the jury.

Following the closing arguments of counsel, the court charged the jury. The court began by reading from the indictment the grand jury's description of the criminal conduct Thigpen allegedly committed: that Thigpen, an Alabama inmate serving a life sentence, "did unlawfully and with malice aforethought kill Henry Lambeth by striking him with an ax or other blunt instrument, a better description of which being otherwise unknown to the Grand Jury...." The court then instructed the jury that it could find Thigpen guilty of first-degree murder if he, himself, killed Henry Lambeth "willfully, maliciously, and with deliberation and with premeditation" or if Williams took Lambeth's life pursuant to a "conspiracy" or "common enterprise" between Thigpen and Williams to kill Lambeth.[3] The court also instructed the jury as to the lesser offense of second-degree murder, advising the jury that it could find Thigpen guilty of that crime if he willfully and maliciously killed Lambeth "without premeditation or deliberation."

Alabama law in effect at the time of the homicide in this case provided that any convict serving a life sentence, "who commits murder in the first degree while said sentence remains in force against him, shall, on conviction, suffer death." Ala. Code § 13–1–75 (1975).[4] The trial judge interpreted this provision to mean that, in the event the jury found Thigpen (who conceded that he was serving a life sentence at the time of Lambeth's murder) guilty of first-degree murder, the jury, rather than the court, was required to sentence Thigpen to death. Accordingly, the judge so instructed the jury.

The jury, in a general verdict, found Thigpen guilty as charged and imposed the death sentence. Following the court's entry of judgment in accordance with jury's verdict and sentence, Thigpen ap-

---

**2.** A pathologist at trial testified that he was unable specifically to identify the type of instrument used to kill Lambeth, but stated that the wounds found on Lambeth's body were consistent with those that would be inflicted with an ax or hatchet.

**3.** The court also instructed the jury that Thigpen could be found guilty of first-degree murder if he aided and abetted Williams in the commission of the crime.

**4.** Section 13–1–75 has been prospectively repealed, effective January 1, 1980.

pealed. Thigpen challenged the validity of his conviction and sentence on several state law grounds. The Alabama Court of Criminal Appeals, acting *sua sponte*, raised an additional ground concerning Thigpen's sentence: whether his mandatory death sentence violated the United States Constitution. Addressing this ground first, the court observed that the Supreme Court, in *Roberts v. Louisiana*, 431 U.S. 633, 637 n. 5, 97 S.Ct. 1993, 1995 n. 5, 52 L.Ed.2d 637 (1977), "expressed the view that the constitutionality of a mandatory death sentence for a prisoner who commits first-degree murder while serving a life sentence was an open question." *Thigpen v. State*, 355 So.2d 392, 396 (Ala.Crim.App.), *aff'd*, 355 So.2d 400 (Ala.1977) (per curiam). The court therefore adhered to one of its previous decisions, *Harris v. State*, 352 So.2d 460 (Ala.Crim.App.1976), *aff'd*, 352 So.2d 479 (Ala.1977), which had upheld the imposition of such a sentence, and found no constitutional error in Thigpen's death sentence. The court also found no error in Thigpen's conviction. Accordingly, the trial court's judgment was affirmed.

On June 6, 1978, Thigpen filed a petition for writ of error coram nobis with the trial court, claiming that his conviction and death sentence had been obtained in violation of the United States Constitution. He presented seventeen claims. Thigpen's first claim attacked on several independent grounds the constitutional validity of Thigpen's 1972 conviction; absent that conviction and resultant life sentence, Thigpen contended, he could not have been given a mandatory death sentence pursuant to Ala. Code § 13–1–75 (1975) for having committed first-degree murder while serving a life sentence. Thigpen's remaining sixteen claims related to his 1976 first-degree murder conviction and death sentence.

Following an evidentiary hearing, the court, on September 8, 1978, denied Thigpen's petition. Thigpen appealed, raising five of the claims he had presented to the trial court. The first two claims attacked the validity of Thigpen's conviction: blacks and women were substantially underrepresented in the venires from which the grand jury that indicted him and the petit jury that convicted him had been selected, in violation of the sixth and fourteenth amendments. Three claims challenged Thigpen's death sentence on eighth and fourteenth amendment grounds: (1) the sentence was excessive because (a) it was imposed for "aiding and abetting" a murder and (b) Thigpen's accomplice received a lesser sentence, imprisonment for ninety-nine years, for actually committing the murder; (2) Thigpen was sentenced to death on account of his race; and (3) the State selectively and capriciously applied the death penalty statute, Ala.Code § 13–1–75 (1975), in Thigpen's case. The Court of Criminal Appeals rejected each of Thigpen's five claims and affirmed. *Thigpen v. State*, 374 So.2d 401 (Ala.Crim.App.1979).[5]

Having exhausted his state remedies, Thigpen, on May 10, 1982, petitioned the United States District Court for the Southern District of Alabama for a writ of habeas corpus, presenting eleven constitutional claims. Five of these claims, including Thigpen's attack on the venires from which the grand jury and the petit jury were selected, challenged his conviction;[6] six

5. The court specifically held that Thigpen was barred from raising his claim that section 13–1–75 was selectively and capriciously applied because he failed to raise the issue on direct appeal from his conviction and sentence. Alternatively, the court rejected the claim on the merits. The court held that Thigpen failed to show that section 13–1–75 had been invidiously applied because of race. It is unclear from the decision whether the court viewed this claim as also being procedurally barred.

6. These claims were: (1) that blacks and women were substantially underrepresented in the venire from which the grand jury that returned his indictment was selected, in violation of the sixth and fourteenth amendments; (2) that blacks and women were substantially underrepresented in the venire from which his petit jury was selected, in violation of the sixth and fourteenth amendments; (3) that the trial court erred in denying his challenge for cause of certain veniremen who were selected as petit jurors, in violation of the sixth and fourteenth amendments; (4) that the State's introduction of evidence concerning his 1972 conviction for murder denied him a fair trial, in violation of

claims challenged his death sentence.[7] Two days later, on May 12, 1982, Thigpen filed a habeas petition with the United States District Court for the Northern District of Alabama challenging his 1972 murder conviction in Jefferson County. This petition was promptly transferred to the Southern District of Alabama and consolidated with the petition challenging Thigpen's 1976 murder conviction and death sentence. Several months after the State answered Thigpen's two petitions, the State and Thigpen entered into the following stipulation. Thigpen would dismiss the petition addressed to his 1972 Jefferson County conviction. As to the petition challenging his 1976 Escambia County conviction and sentence, Thigpen would dismiss the five claims questioning the validity of his conviction. He would then litigate the remaining six claims of that petition concerning the validity of his death sentence. After the litigation of these claims ran its full course, Thigpen could refile the first petition, challenging his 1972 conviction, and file a second habeas petition containing the five claims challenging his 1976 conviction that he had previously dismissed. The State, in turn, would not oppose these new petitions as successive or as an abuse of the writ. *See* Rule 9(b), Successive Petitions, Rules Governing Section 2254 Cases, 28 U.S.C. fol. § 2254 (1982). The parties presented their stipulation to the district court, and the district court approved it in an order entered on December 5, 1983.

The stipulation was not made a part of the record; consequently, we can only speculate as to why the parties entered into it.

The district court apparently thought that the parties wanted to litigate the constitutionality of the Alabama mandatory death sentencing provision, Ala.Code § 13–1–75 (1975), pursuant to which Thigpen had been sentenced, because the court, in approving the stipulation, stated that Thigpen

shall have the right to refile [the dismissed petition and] claims [attacking Thigpen's two murder convictions] following the adjudication of the constitutionality of Code of Alabama, 1975, § 13–1–75 (since repealed), and that upon refiling, both parties retain the right to raise the claims, defenses, issues, and arguments that they had raised or could have raised on the date the stipulation was entered, the same as if the stipulation had never been entered into.

Thus, both the parties and the court treated the two petitions as though none of the claims they presented were being dismissed; for, regardless of the ultimate decision as to the constitutionality of Thigpen's 1976 death sentence, Thigpen was going to go forward with his remaining claims, which, if valid, would nullify both of his convictions.

Once it dismissed Thigpen's petition attacking his first conviction and the claims directed to his second conviction, the district court addressed the constitutionality of Ala.Code § 13–1–75 (1975).[8] The court considered five arguments advanced by petitioner that the statute on its face violated the eighth and fourteenth amendments: (1) the statute prevented individualized consid-

---

the eighth and fourteenth amendments; and (5) that the State failed to turn over to the defense a statement it had obtained from petitioner without giving him a *Miranda* caution and subsequently placed in evidence at trial, in violation of the fifth and fourteenth amendments.

7. These claims, all grounded in the eighth and fourteenth amendments, were: (1) that section 13–1–75 is invalid on its face; (2) that the sentencer failed to consider mitigating circumstances; (3) that the State selectively and capriciously applied section 13–1–75; (4) that the State applied section 13–1–75 to Thigpen because he was a male and black; (5) that the State has applied its death penalty statutes in a

sexually and racially discriminatory manner; and (6) that Thigpen's death sentence was excessive.

8. Neither party requested an evidentiary hearing; both Thigpen and the State apparently viewed the issues before the court as purely legal. We note that, although Thigpen's petition, as amended to delete the claims addressed to Thigpen's conviction, questioned and the district court decided the constitutionality of section 13–1–75, the sole issue for the court's determination was the constitutionality of the petitioner's sentence, not the constitutionality of section 13–1–75.

eration of all relevant sentencing factors; (2) the statute created a danger of jury nullification because certain jurors might refuse to convict an obviously guilty offender if a conviction would result in the imposition of a death sentence; (3) the statute precluded meaningful appellate review of a death sentence; (4) the statute offended fundamental societal values; and (5) the statute mandated excessive punishment without penological justification. The district court, in a comprehensive opinion, responded to each of these arguments and concluded that section 13–1–75 was facially constitutional.

The court then turned to Thigpen's remaining claims attacking his sentence. It held that two of these claims—that the State applied section 13–1–75 in a selective and capricious manner and in a racially and sexually discriminatory fashion—were barred by *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), because Thigpen failed seasonably to raise such claims in state court and had not demonstrated the "cause" and "prejudice" mandated by *Sykes* so to permit the court to consider them on the merits. The court rejected Thigpen's claim that the State had been applying its death penalty statutes discriminatorily, because the evidence Thigpen proffered in support of this claim failed to establish a prima facie case. The court rejected Thigpen's claim that his death sentence was excessive—Williams, the more culpable offender, having received a lesser sentence—because, the jury, in convicting Thigpen of first-degree murder, necessarily found that he actively participated in the killing.

Thigpen appeals, challenging each of the district court's rulings regarding the facial and as applied constitutionality of Ala.Code § 13–1–75 (1975). We do not consider these rulings because we conclude that the district court disregarded the venerable policies, enforced by Rule 9(b), Successive Petitions, Rules Governing Section 2254

Cases, 28 U.S.C. fol. § 2254 (1982), that counsel against the piecemeal litigation of habeas corpus petitions. Those policies require us to vacate the district court's judgment.

## II.

We begin our discussion by noting the degree to which the parties in this case have subverted the usual judicial processes for adjudicating collateral attacks of state court convictions and sentences pursuant to 28 U.S.C. § 2254 (1982). The parties agreed, and obtained the district court's approval, to litigate this case in a piecemeal fashion, first obtaining a determination of the constitutionality of petitioner's death sentence and postponing for a future and separate petition all claims relating to the underlying conviction. In contrast to this procedure, strong policy considerations have caused the Congress, in enacting the statute and rules governing habeas cases, and the courts, in formulating long-established principles, to require that all known and available grounds that could support a grant of habeas relief be brought and adjudicated in a single petition.

Rule 9(b), Successive Petitions, Rules Governing Section 2254 Cases, 28 U.S.C. fol. § 2254 (1982), provides that:

A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

This rule restates the principles judicially developed in the abuse of the writ doctrine, *see Paprskar v. Estelle*, 612 F.2d 1003, 1005 (5th Cir.), *cert. denied*, 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980),[9] which require in part that known grounds for habeas relief be raised in one proceeding.

**9.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

The policies behind the rule are not hard to discern. First and foremost, the rule is designed to ease the burden placed on federal courts by litigious habeas petitioners who file numerous requests for relief. As the Supreme Court emphasized in *Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963), "[n]othing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, to entertain collateral proceedings whose only purpose is to vex, harass, or delay." *See also Booker v. Wainwright*, 764 F.2d 1371, 1376 (11th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985); *Haley v. Estelle*, 632 F.2d 1273, 1275 (5th Cir.1980). Were habeas petitioners permitted to litigate individual grounds for relief in separate petitions, federal courts would be inundated to the point of paralysis. By requiring a habeas petitioner to include in his petition all known and available grounds of relief, Rule 9(b) protects a petitioner's right to seek habeas relief while also protecting the efficient administration of justice in the federal courts.

The legislative history involving 28 U.S.C. § 2244(b) (1982),[10] a statute that essentially tracks Rule 9(b), illustrates the concern the Congress had over the effect the filing of successive petitions had on the federal courts:

> The number of applications by State prisoners for writs of habeas corpus has been steadily increasing. In 1941 only 134 such writs were filed in the Federal district courts. By 1957 the number had grown to 814. In fiscal 1963, 1,692 applications were filed by State court prisoners; in fiscal 1964, 3,248 applications were filed; in fiscal 1965, 4,845 applications were filed; and in the first 9 months of fiscal 1966, 3,773 applications were filed. More than 95 percent of these applications were held to be without merit.
>
> Although only a small number of these applications have been found meritorious, the applications in their totality have imposed a heavy burden on the Federal courts. In many instances the burden has been an unnecessary one, since the State prisoners have been filing applications either containing allegations identical to those asserted in a previous application that has been denied, or predicated upon grounds obviously well known to them when they filed the preceding application. The bill seeks to alleviate the unnecessary burden by introducing a greater degree of finality of judgments in habeas corpus proceedings.

S.Rep. No. 1797, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad. News 3663, 3663–64. Nor is the burden solely on the district courts. Most district court habeas decisions are appealed to the court of appeals as a matter of right. Further, although the Supreme Court may decline review by refusing to grant certiorari, it must still expend considerable judicial resources reviewing the petitions seeking certiorari in habeas cases.

In addition to reducing the burden that successive habeas petitions place upon federal courts, requiring that all claims be litigated in one proceeding has numerous other advantages. First, a court is able to provide a "more focused and thorough" review of the claims presented if it has all of the claims before it at one time. *See Rose v. Lundy*, 455 U.S. 509, 520, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 329 (1982). Further, prohibiting piecemeal litigation "enable[s]

---

**10.** 28 U.S.C. § 2244(b) (1982) provides:

When after an evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ.

the federal system to conserve judicial and parajudicial resources, in that the trial and appellate courts need familiarize themselves with a petitioner's case but once." *Blake v. Kemp*, 758 F.2d 523, 543 (11th Cir.) (Tjoflat, J., dissenting), *cert. denied*, —— U.S. ——, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985); *see also Galtieri v. Wainwright*, 582 F.2d 348, 356 (5th Cir.1978) (en banc).[11] This economy of resources in turn benefits other litigants, including habeas petitioners, because courts will be able to make a more timely determination of the merits of their cases.

Rule 9(b) also protects the State from expensive and time-consuming litigation. The Rule facilitates the preservation of evidence, for were it not enforced, the State would be required to preserve all relevant evidence until the time, after several possible petitions, when the claim to which that evidence relates is eventually raised. Of course, evidence is, by its nature, fragile and susceptible to destruction over time, as memories fade and witnesses die or become otherwise unavailable. Finally, correctional systems and rehabilitation programs suffer when a prisoner is continually required to appear before the district court as a result of piecemeal litigation.

■ Rule 9(b) also plays an important role in preventing provisional decision making. Article III, section 2 of the United States Constitution confines federal court jurisdiction to "cases" and "controversies." Federal courts, therefore, have no authority to issue advisory or hypothetical decisions. *See, e.g., Church of Scientology Flag Service Organization v. City of Clearwater*, 777 F.2d 598 (11th Cir.1985). Without a rule restricting the use of successive petitions, federal courts would often be forced to make provisional decisions. This case presents a prime example of such a situation. Were we to reach the merits of petitioner's challenge to his death sentence, regardless of whether we affirmed the district court and allowed the sentence to stand or reversed the district court thus mandating resentencing, petitioner is certain to file a new petition aimed at overturning his conviction, raising among other issues his challenges to the grand and petit jury venires. Should he succeed in either of those challenges and have his conviction vacated, anything that we would have said in this case regarding the constitutionality of his sentence would have become wholly advisory. Thus, Rule 9(b), by requiring that all known claims be raised in one petition, helps prevent provisional decision making.[12]

The stipulation entered into by the parties and approved by the district court in this case creates the precise situation that Rule 9(b) was designed to prevent. The

---

**11.** We recognize that *Rose, Blake,* and *Galtieri,* involved the exhaustion of state remedies requirement rather than the abuse of the writ doctrine. Like Rule 9(b) the exhaustion requirement is in part designed to prevent piecemeal litigation by requiring that all claims be brought before the district court and decided at one time. *See Rose,* 455 U.S. at 520, 102 S.Ct. at 1204; *see also Galtieri,* 582 F.2d at 356. In contrast to the exhaustion requirement, however, Rule 9(b) is not based in large part upon comity concerns which dictate that the State have the first opportunity to redress alleged federal constitutional violations.

**12.** Rule 9(b) also has a subtle but essential place in the adjudication of habeas petitions where the constitutionality of a state statute may be implicated by a decision to grant or deny relief. *See supra* note 8. Courts have a duty to avoid deciding constitutional questions unless strictly necessary. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341–56, 56 S.Ct. 466, 480–87, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); J. Nowak, R. Rotunda & J. Young, *Constitutional Law* 93–94 (2d ed. 1983). This is especially true where the constitutionality of legislation is involved. *See Rescue Army v. Municipal Court,* 331 U.S. 549, 568–75, 67 S.Ct. 1409, 1419–23, 91 L.Ed. 1666 (1947). Where other grounds exist that would support the decision, constitutional issues should not be addressed. Habeas actions, of course, by their very nature require the court to determine a constitutional question: is the petitioner's conviction and/or sentence unconstitutional? There are circumstances, however, where such a ruling will implicate the constitutionality of a state statute. By requiring that all claims be adjudicated in one proceeding, Rule 9(b) permits an appellate court to view issues affecting the operation of a state statute in light of other issues and determine whether a ruling on the former issues is necessary and appropriate.

parties agreed to litigate only the claims attacking Thigpen's 1976 death sentence; the claims challenging his 1976 conviction will be raised in a separate petition. Such an arrangement ensures that Thigpen will file multiple, successive petitions challenging his 1976 conviction and sentence, resulting in the very evils Rule 9(b) was intended to avoid: inefficient use of judicial resources; an inability to review *all* of the claims in a "focused and thorough" manner; the necessity for both the trial and appellate courts to familiarize themselves with the case more than once; the detriment and delay other litigants must suffer due to inefficient judicial administration; the loss of evidence as time passes; the disruption of the State's correctional system; and the likelihood that we will be forced to engage in provisional decision making. Thus, it is clear that the stipulation entered into by the parties is plainly inconsistent with the policies underlying Rule 9(b).

■ We now examine the effect of the State's agreement not to seek the enforcement of Rule 9(b) and the district court's approval of that agreement. The State, in entering into the stipulation with Thigpen, agreed not to argue, upon the filing of a subsequent petition challenging his 1976 conviction, that the petition was successive and should be dismissed pursuant to Rule 9(b). Although, as we have noted, Rule 9(b) serves to vindicate some of the State's interests, the chief beneficiary of the rule is the federal courts themselves and the public which turns to those courts to obtain justice. Because of this wide-spread interest in the enforcement of Rule 9(b), it would be improper to hold that the State's failure to assert the rule must result in its nonapplication.[13]

■ In the present case, the district court approved the stipulation the State entered into with Thigpen. By so acting, the district court sanctioned the suspension of Rule 9(b) as regards Thigpen's subsequent petition. But just as the policy considerations of Rule 9(b) reach beyond concerns of the State, they reach beyond the concerns of the district courts as well. Successive petitions burden the court of appeals, the Supreme Court, and the public at large. A district court cannot frustrate the interests of these parties and decide that, as to certain petitions filed with it, Rule 9(b) will not be enforced. It is readily apparent that the important concerns served by Rule 9(b) would be severely undermined if the practice followed in this case were to become widespread.[14]

■ Given the strong policy considerations behind Rule 9(b), we conclude that the

13. Statements in *Sanders v. United States*, 373 U.S. 1, 10–11, 83 S.Ct. 1068, 1074–75, 10 L.Ed.2d 148 (1963), which was decided prior to the promulgation of Rule 9(b), and in the Advisory Committee Note following Rule 9, indicating that the burden is on the government to plead abuse of the writ, are not to the contrary. These statements were made in response to the question whether a petitioner should be required to plead in his petition that the petition does not constitute an abuse of the writ. *Sanders*, 373 U.S. at 11, 83 S.Ct. at 1075. The Court determined that "it would be unfair to compel the habeas applicant, typically unlearned in the law and unable to procure legal assistance in drafting his application, to plead an elaborate negative," *id.*, and instead placed the burden of pleading abuse of the writ on the state, which would necessarily have access to the relevant information. Such language was not intended to limit a federal court's ability to raise *sua sponte* the issue of abuse of the writ thereby effectuating the policy considerations behind Rule 9(b). In fact, the language of Rule 9(b) states that a successive petition may be dis-

missed if the *judge* finds that it constitutes an abuse of the writ, indicating that the court has the power to invoke the rule on its own, initiative, as a necessary means of managing its docket. A district court's authority to raise *sua sponte* the issue of an abuse of the writ has been explicitly recognized by the Fifth Circuit. *See Daniels v. Blackburn*, 763 F.2d 705, 707 (5th Cir.1985); *Jones v. Estelle*, 722 F.2d 159, 164 (5th Cir.1983) (en banc), *cert. denied*, 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984); *Sockwell v. Maggio*, 709 F.2d 341, 343–44 (5th Cir.1983).

14. On the other hand, we can discern no possible advantage to pursuing the piecemeal litigation strategy agreed to by the parties. Although they appear anxious to resolve the issues involving the constitutionality of petitioner's death sentence, those issues would necessarily be resolved in a proceeding addressing all of petitioner's claims arising out of his 1976 conviction. We are at a loss to understand the need to isolate those issues from the rest of petitioner's claims and address them in the unusual and

district court erred in approving the stipulation entered into by Thigpen and the State.[15]  Although we are mindful that neither party urges us to vacate the district court's judgment and remand for proceedings involving all claims challenging Thigpen's 1976 conviction and sentence, our obligation to oversee the efficient administration of justice requires that we do so.[16]

The judgment of the district court is, accordingly, vacated and the cause is remanded for further proceedings not inconsistent with this opinion.

VACATED and REMANDED.

undesirable fashion called for by the parties' agreement.

15. Our conclusion is reinforced if one disregards the form of what occurred in the district court and carefully examines the substance.  Although the unlitigated claims in this case technically were dismissed, the effect of the stipulation entered into is that the district court denied the writ as to certain of the claims raised in the petition, concerning the sentence imposed, and has yet to adjudicate the remaining claims.  Federal appellate courts have jurisdiction to review only final decisions and certain specific interlocutory orders of the district court, *see* 28 U.S.C. §§ 1291, 1292 (1982), or partial final judgments entered pursuant to Fed. R.Civ.P. 54(b).  The final judgment rule enjoys equal vitality in the context of habeas corpus proceedings.  *See Andrews v. United States,* 373 U.S. 334, 340, 83 S.Ct. 1236, 1240, 10 L.Ed.2d 383 (1963) ("[t]he standards of finality to which the Court has adhered in habeas corpus proceedings [is] no less exacting [than in other cases]").  Where a district court issues an order rejecting several claims contained in a habeas petition, but makes no determination as to the remaining claims, the order refusing to issue the writ is not final and consequently does not come within a reviewing court's jurisdiction.  *See Collins v. Miller,* 252 U.S. 364, 40 S.Ct. 347, 64 L.Ed. 616 (1920).  The practical difference between the procedural posture of the present case and the situation where the writ is denied after adjudicating only some of the claims raised in the petition is negligible, at best.

16. We do not decide whether Thigpen's subsequent refiling of his petition addressing his 1972 murder conviction could constitute an abuse of the writ.  That petition is not before us.